**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TYRELLE MITCHELL, | |
| *Petitioner,* | CIVIL ACTION |
| v. | NO. 6-821 |
| LOUIS FOLINO *et al.,* | |
| *Respondents.* | |

**PAPPERT, J.**                                                     **July 30, 2019**

## MEMORANDUM

On February 24, 2006, Tyrelle Mitchell filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. He challenged his 1991 state court conviction, arguing that his Fifth Amendment rights were violated and that trial counsel was ineffective for failing to call exculpatory witnesses and for declining an alibi instruction. On December 21, 2007, Magistrate Judge Strawbridge issued a Report and Recommendation ("R. & R.") recommending an evidentiary hearing on Mitchell's ineffective assistance of counsel claim and denial of the Petition as to all other grounds. Both parties filed objections, with Respondents objecting to the portion of the R. & R. granting the evidentiary hearing. On March 16, 2009, Judge Gardner overruled Respondents' objection, adopted and approved the R. & R. with respect to the evidentiary hearing and dismissed Mitchell's other objections without prejudice. The matter was remanded to Judge Strawbridge, who held an evidentiary hearing on the ineffective assistance of counsel claim on June 23 and 24, 2009.

On May 31, 2011, Judge Strawbridge issued a Supplemental R. & R. ("Supp. R. & R.") recommending denial of the Petition. Mitchell timely objected to the Supplemental R. & R. The case was reassigned from Judge Gardner to this Court on May 30, 2017. After thoroughly reviewing the record, Judge Strawbridge's Supplemental R. & R. and Mitchell's objections, the Court adopts the Supplemental R. & R. and denies Mitchell's Petition.

## I

## A

The facts of this case are set forth in detail in Judge Strawbridge's R. & R. and Supplemental R. & R. *See* (R. & R. at 3–25, ECF No. 45; Supp. R. & R. at 2–23, ECF No. 132). The Court briefly summarizes those facts relevant to its review of Mitchell's objections.

On April 12, 1990, Kevin Scott was shot to death and Mitchell was charged with his murder. *See* (R. & R. at 8; Supp. R. & R. at 3). The state court record reflects that Mitchell was represented by two attorneys in the early stages of the proceedings. *See* (Supp. R. & R. at 9–10). On June 28, 1990, Daniel Rendine appeared on Mitchell's behalf at his preliminary hearing in the Philadelphia Court of Common Pleas. *See* (*id.* at 10). Rendine later moved to suppress physical evidence, an identification at a lineup and the statement Mitchell gave to the police after he was arrested. *See* (*id.* at 10–11). On November 29, 1990, Judge Sabo listed the case for trial. *See* (*id.* at 11). Around that time, Rendine learned that Mitchell's prior counsel had hired an investigator to interview various witnesses. *See* (*id.*). Rendine obtained an order from Judge Sabo directing prior counsel to turn over the investigator's file (the "OSI Report"), but he had

difficulty securing compliance with that order. *See* (*id.*). The case was continued on December 5, 1990. *See* (*id.*).

Trial began on February 13, 1991. *See* (*id.*). Rendine pursued theories of misidentification and self-defense, arguing that Mitchell did not shoot Scott but, if the jury found that he did, Mitchell acted in self-defense. *See* (*id.* at 11–14). The jury heard from several defense witnesses, including Mitchell's longtime friend, Victoria Martinez. *See* (*id.* at 13). Martinez testified that she was with Mitchell and others on the night of Scott's murder. *See* (*id.*). On cross-examination, Martinez acknowledged that she did not come forward to tell the police Mitchell "had an alibi" after she learned he had been arrested for Scott's murder. *See* (*id.* at 14) (citation omitted). Rendine did not request an alibi instruction during the charging conference; he instead requested instructions pertaining to misidentification and self-defense. *See* (*id.*).

On February 23, 1991, Mitchell was convicted of first-degree murder, four aggravated assault charges and weapons offenses related to the shooting. *See* (*id.* at 17). On February 25, the court re-convened to sentence Mitchell on the murder conviction. *See* (*id.*). Before the jury was brought in, Rendine notified the court that Mitchell's mother had spoken with Scott's mother over the preceding weekend. *See* (*id.* at 17–18). That conversation led Rendine to believe that "several people [who] were afraid to come forward because they were being threatened" had now "come forward with another version of this incident . . . which would relieve [Mitchell] of criminal responsibility." (*Id.* at 18) (citation omitted). Judge Sabo told Rendine that he "can't stop anything at this stage" and instructed him to file post-trial motions. *See* (*id.*)

(citation omitted). Mitchell was sentenced to life in prison for the murder and sentencing for the other offenses was deferred. *See* (*id.*).

Rendine filed post-trial motions, which included a request for an evidentiary hearing on the "after-discovered evidence" he had previously discussed with Judge Sabo. *See* (*id.*) The judge denied the request on March 20, 1992, because he believed the issue would have to be addressed in a petition under the Post-Conviction Relief Act ("PCRA") pursuant to 42 Cons. Stat. §§ 9541–9546. *See* (*id.* at 19). That same day, Mitchell was sentenced for the aggravated assault and weapons convictions. *See* (*id.* at 20).

Mitchell subsequently filed a *pro se* "Motion for Reconsideration of Sentence & Petition for Writ of Coram Nobis," asking the court to consider "after discovered evidence" that "was not available to defendant for trial in [ ] spite of due diligence" and identified Vernetta Corey[1] and Darryl Finley as "two important defense witnesses" who were not presented at trial. (*Id.* at 21) (citation omitted). Judge Sabo denied the motion on April 13, 1992. *See* (*id.*).[2] The Pennsylvania Superior Court affirmed Mitchell's conviction. (R. & R. at 2, ECF No. 45.) On February 23, 1994, the Pennsylvania Supreme Court denied his petition for *allocatur*. *See* (*id.*). Mitchell did not seek review in the United States Supreme Court. *See* (*id.*).

---

[1]     Judge Strawbridge stated that "it became apparent at the evidentiary hearing that the reference to Vernetta Corey is a reference to Vanessa Griffin." *See* (Supp. R. & R. at 21 n. 23).

[2]     Judge Strawbridge noted that the state court docket entries indicated that Mitchell's motion was denied but that Judge Sabo's later opinion seemingly construed the petition for writ of *coram nobis* as a petition filed under the PCRA that was "withdrawn without prejudice at the time of the PCRA hearing on April 13, 1992 due to a lack of witnesses." *See* (Supp. R. & R. at 21) (citations omitted).

B

On January 10, 1997, Mitchell filed a *pro se* PCRA petition. *Com. v. Mitchell*,

No. 1572 EDA 2001, slip op. (Jan. 18, 2005).[3]  Judge Sabo appointed counsel for

Mitchell, who filed an amended petition, arguing Rendine's ineffectiveness for failure to

seek an alibi instruction and failure to present alibi witnesses. *See id.* at 2.  The case

was reassigned to Judge Mazzola in 1998 upon Judge Sabo's retirement. *See* (R. & R.

at 3).  Judge Mazzola dismissed the petition on April 23, 2001 without holding an

evidentiary hearing and issued his opinion on November 17, 2003. *See* (*id.*).  Mitchell

appealed to the Pennsylvania Superior Court, which affirmed Judge Mazzola's decision

on January 18, 2005. *See* (*id.*).  With respect to Mitchell's claim of trial ineffectiveness

for failing to call alibi witnesses, the Superior Court recited the PCRA court's

determination that because Mitchell failed to show he was prejudiced by the absence of

testimony from these witnesses, "his claim was dismissed as meritless." *Mitchell*, slip

op. at 9.  The Superior Court also added:

> There is no other written account (be it notarized or otherwise) existing in the
> official record.  This is fatal to [Mitchell's] contention that trial counsel was
> ineffective for failing to call known and existing alibi witnesses (i.e., Moore and
> Griffin), none of whom executed affidavits in support of their proposed testimony
> . . . Inclusion of copies of affidavits executed by alleged alibi witnesses Latrice

---

[3]  Three days after Mitchell filed his petition, Latrice Moore executed an affidavit, in which she stated that she lived at 3056 North 8th Street during the time of the shooting.  (Supp. R. & R. at 22 & n. 25) (citation omitted).  She "was contacted prior to Tyrelle's [trial] by his counsel concerning what she knew," and that she had appeared in court on a particular, unspecified day and was "willing to cooperate" but Rendine did not put her on the stand.  (*Id.* at 22) (citation omitted).  Moore contended that Kevin Johnson shot Scott.  (*Id.* at 22) (citation omitted).  She also asserted that she was willing to testify at the time of trial that Mitchell was in her house during the shooting.  (*Id.*)  Vanessa Griffin, Moore's sister, also provided an affidavit that was notarized on May 13, 1999. *See* (*id.* at 23).  She lived at 3056 North 8th Street, and her affidavit was similar to Moore's, declaring that she "would have testified that on April 12, 1990, when Kevin Scott was shot and killed, after hearing two or three shots outside of my home, I saw Tyrell [*sic*] Mitchell sitting in my living room." (*Id.*) (citation omitted).

Moore and Vanessa Griffin, which are attached to [Mitchell's] appellate brief, are not sufficient to undo not submitting the originals as part of the official record.

*Id.* at 10–11.[4]  The court concluded by "finding no merit to any of the PCRA claims." *Id.* at 11.  The Pennsylvania Supreme Court denied Mitchell's petition for *allocatur* on November 23, 2005.  *Com. v. Mitchell*, 586 Pa. 710, 889 A.2d 1214 (2005).

C

Mitchell, again represented by counsel, filed his habeas petition on February 24, 2006, contending: (1) that trial counsel was ineffective for failing to call certain exculpatory witnesses; (2) that trial counsel was ineffective for declining an alibi instruction and (3) that his Fifth Amendment rights were violated when evidence of his silence in the face of an accusation was introduced against him.  *See* (ECF No. 1).[5] Judge Strawbridge issued his R. & R. on December 21, 2007, in which he recommended granting an evidentiary hearing allowing Mitchell to further develop a record in support of his claim that Rendine was ineffective for failing to call Moore and Griffin at trial.  *See* (R. & R. at 48–54).  Judge Strawbridge recommended denial of the Petition on all other grounds.  *See* (*id.* at 54–79).  Both parties filed objections, with Respondents objecting solely to the portion of the R. & R. recommending the evidentiary hearing.  (ECF Nos. 50 & 51.)

---

[4]     Judge Mazzola's 2003 Opinion states that on April 2, 1999 and May 13, 1999, the PCRA Court "allowed Mitchell to supplement his petition with affidavits from three purported alibi witnesses."  *See* (Pet., Ex. 7 at 2, ECF No. 1).

[5]     Mitchell also claimed that the Pennsylvania Superior Court made an unreasonable factual finding when it determined that Mitchell's ineffective assistance of counsel claim was procedurally barred as to Moore and Griffin.  *See* (ECF No. 1).  Judge Strawbridge found that this claim did not state "an independent basis" for habeas relief.  (R. & R. at 31 n. 30.)  Because it was related to Mitchell's ineffective assistance of trial counsel claim for failure to call certain witnesses, Judge Strawbridge addressed those issues in conjunction in his R. & R.  (*Id.*)

On March 16, 2009, Judge Gardner overruled Respondents' objection and adopted and approved the R. & R. with respect to the evidentiary hearing. *See* (Order, ECF No. 77). He remanded the matter to Judge Strawbridge to conduct a hearing on Mitchell's ineffective assistance of counsel claim for failure to call Moore and Griffin at trial and "for preparation of a supplemental report and recommendation" addressing the remaining issues related to that claim. (*Id.* at 5.) He dismissed Mitchell's other objections without prejudice, instructing him to "raise [them] after a supplemental report and recommendation is filed." (*Id.* at 5.) Judge Gardner also ordered the Clerk of Court to place the case in civil suspense "until such a time that a supplemental report and recommendation is filed." (*Id.* at 5–6.)

Judge Strawbridge held the evidentiary hearing on June 23 and 24, 2009. *See* (ECF Nos. 109–10). Mitchell presented the testimony of four witnesses: Moore, Griffin, Rendine and Mitchell's mother, Patricia Mitchell Oden. *See* (Supp. R. & R. at 24). On May 31, 2011, Judge Strawbridge issued his Supplemental R. & R., where he made a series of factual findings based largely on the witnesses' testimony. *See* (*id.* at 42–46). He ultimately determined that Mitchell had not demonstrated that Rendine performed deficiently at trial under *Strickland v. Washington*, 466 U.S. 668 (1984), and recommended that Mitchell's claim be denied. *See* (*id.* at 45–62). Mitchell timely objected to the R. & R. on June 10, 2011. (ECF No. 134.)[6] There was no activity in the case from 2011 until 2015, when an attorney from the Philadelphia District Attorney's Office entered his appearance. (ECF No. 151.)

---

[6] Because Mitchell has not renewed his objections with respect to the alibi instruction or the violation of his Fifth Amendment rights, this Memorandum only addresses Mitchell's objections with respect to his ineffective assistance of counsel claim for failure to call Moore and Griffin at trial.

## II

Mitchell now lodges through counsel seventeen objections to Judge Strawbridge's Supplemental R. & R. (Obj., ECF No. 134.) "[F]or the portion of the R&R to which no objection [is] made, the Court reviews the R&R for clear error." *Harris v. Mahally*, No. 14-2879, 2016 WL 4440337, at *4 (E.D. Pa. Aug. 22, 2016).[7] The Court reviews *de novo* the specific portions of the R. & R. to which a party objects. *See* 28 U.S.C. § 636(b)(1); *see also Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### A

Section 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's ability to grant *habeas corpus* relief to a petitioner based upon a federal constitutional claim that was "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Where § 2254(d) applies, habeas relief shall not be granted unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[7] When reviewing those portions of the report to which no objection is made, the Court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b) advisory committee notes; *see also Oldrati v. Apfel*, 33 F. Supp. 2d 397, 399 (E.D. Pa. 1998). For the portions of the R. & R. to which Mitchell has not objected, no clear error appears on the face of the record and the Court accordingly accepts Judge Strawbridge's recommendation.

*Id.* A state court ruling is "contrary to . . . clearly established Federal law" if the court applies a rule that contradicts governing law set by the Supreme Court or if the court confronts a set of facts that are materially indistinguishable from a Supreme Court decision but arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406–07 (2000). A state court ruling "is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009). The petitioner must demonstrate that the state court's analysis was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Where the state court's resolution of a claim required it to make a factual determination, the statute further provides that the state court's factual determination "shall be presumed to be correct," and that the petitioner bears the burden to rebut this presumption with a showing of "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B

The Supreme Court's two-part test in *Strickland* governs claims for ineffective assistance of counsel. 466 U.S. at 669. "To succeed on such a claim, the petitioner must demonstrate (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that the petitioner suffered prejudice as a result of the deficiency." *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) (citing *Strickland*, 466 U.S. at 687)). With respect to *Strickland*'s first prong, there is a "strong presumption" that counsel's performance was not deficient. *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). "[S]trategic choices made after thorough investigation of law

and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466

U.S. at 690. Where "the record does not explicitly disclose trial counsel's actual

strategy or lack thereof (either due to lack of diligence on the part of the petitioner or

due to the unavailability of counsel), the presumption may only be rebutted through a

showing that no sound strategy . . . could have supported the conduct." *Thomas v.

Varner*, 428 F.3d 491, 500 (3d Cir. 2005).

With respect to prejudice, the defendant must show "that counsel's

representation fell below an objective standard of reasonableness." *Strickland*, 466

U.S. at 688. To make this showing, the "[d]efendant must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a

different result must be substantial, not just conceivable." *Harrington v. Richter*, 562

U.S. 86, 112 (2011). The Court must consider the totality of the evidence before the

jury in determining whether a petitioner satisfied this standard. *See Berghuis*, 560

U.S. at 389. Further, counsel cannot be found to be ineffective for failing to pursue a

meritless claim. *See United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015) ("'[T]here

can be no Sixth Amendment deprivation of effective counsel based on an attorney's

failure to raise a meritless argument.'") (quoting *United States v. Sanders*, 165 F.3d

248, 253 (3d Cir. 1999)).

III

Though many of Mitchell's objections are repetitive and reflect a factual as opposed to legal disagreement, the Court addresses them in turn.[8]

A

Several of Mitchell's objections concern Judge Strawbridge's credibility determinations. First, Mitchell objects to Judge Strawbridge's finding that Moore's testimony was "uncorroborated, contradicted, and sometimes incredible." (Obj. #6(d) at 7– 8.) Judge Strawbridge concluded that her testimony about that night's events—such as her reference to Scott emerging from a car and that the police and Rendine told her Mitchell had confessed—"seriously undermined her credibility." (Supp. R. & R. at 44.)[9] Second, Mitchell objects to Judge Strawbridge's conclusion that Mitchell's "lack of participation in his own defense also contributed to a sense of uncertainty as to which defense theories could lead to credible evidence." (Obj. #11 at 11–12) (quoting Supp. R. & R. at 53). Judge Strawbridge credited Rendine's testimony that Mitchell did not give him the names of any witnesses. *See* (Supp. R. & R. at 37–38, 53). Finally, Mitchell

---

[8]    For example, in one of his "objections," Mitchell contends that the "exhaustion of remedies issue may [not] be re-litigated." (Obj. #8 at 10) (citing Supp. R. & R. at 49). In distinguishing his Supplemental R. & R. from his initial one, Judge Strawbridge clarified that the Supplemental R. & R. would only focus upon Mitchell's ineffectiveness claim for failing to call Moore and Griffin:

> Inasmuch as the statute permits the Court to resolve the petition by denying it on the merits notwithstanding any alleged defects in the exhaustion of state remedies, we will not revisit the question of the propriety of expanding the record through the federal evidentiary hearing or whether Petitioner failed to satisfy his obligation to exhaust remedies available in the state courts.

(Obj. #8 at 10) (citing Supp. R. & R. at 49). Mitchell's "objection" is nothing more than an agreement with Judge Strawbridge that the issue of the exhaustion of remedies will not be revisited.

[9]    Mitchell also objects to the conclusion that "[n]o one accounted for the lack of a shotgun at the scene." (Obj. #12 at 12) (quoting Supp. R. & R. at 53 n. 52.) Mitchell argues that Moore's affidavit stated that a white car appeared and "picked up" Scott's shotgun. (Obj. #12 at 12.) But Judge Strawbridge called into question Moore's credibility given the inconsistency of her testimony.

objects to Judge Strawbridge's determination that Moore and Griffin did not make themselves available to testify. (Obj. #13 at 12).

District court judges exercise *de novo* review over an R. & R. "stemming from an evidentiary hearing conducted as part of the review of a habeas petition." *Coombs v. DiGuglielmo*, 581 Fed. App'x 129, 133 (3d Cir. 2014) (citing 28 U.S.C. § 636(b)(1)). The Third Circuit has held, however, that "[a] district court may not reject a finding of fact by a magistrate judge without an evidentiary hearing, where the finding is based on the credibility of a witness testifying before the magistrate judge and the finding is dispositive of an application for post-conviction relief involving the constitutional rights of a criminal defendant." *Hill v. Beyer,* 62 F.3d 474, 482 (3d Cir. 1995). Thus, "when the magistrate judge holds an evidentiary hearing that includes the testimony of live witnesses, a district court cannot ordinarily reject the magistrate judge's credibility determinations unless it holds its own evidentiary hearing." *Coombs*, 581 Fed. App'x at 133. The rationale is that "[o]ur judicial system affords deference to the finder of fact who hears the live testimony of witnesses because of the opportunity to judge the credibility of those witnesses." *Hill*, 62 F.3d at 482. The Court accepts Judge Strawbridge's assessments of the witnesses' credibility and the respective weight given to their testimony.

## B

Mitchell next objects to "the admission into evidence and the magistrate's findings and conclusions in connection with the police report of [Mitchell's] alleged April 12, 1990 statement to police." (Obj. #1 at 1–2.) Respondents argue that Mitchell's statement was properly limited in its use at the evidentiary hearing and that no portion

of Judge Strawbridge's analysis "hinges on this document." (Resp. Opp'n at 8, ECF No. 143.)

On December 5, 1990, Rendine moved to suppress Mitchell's statement to the police. *See* (Supp R. & R. at 9 n. 10). At the evidentiary hearing in 2009, Rendine testified that, because he had litigated the motion to suppress, he was aware of the statement's contents before trial began in 1991. *See* (Evid. Hr'g Tr. 66:24–67:4, ECF No. 111). Respondents sought to question Rendine about the impact the statement may have had on his approach to calling witnesses who claimed to be with Mitchell at the time of Scott's murder. (*Id.* at 68:6–14.) When Mitchell objected to the statement as hearsay, Judge Strawbridge disagreed, finding that that it went to "the principal issue that's been raised here [which] concerns Mr. Rendine's conduct in his representation of Mr. Mitchell." (*Id.* at 69:12–5.) Because the statement was used to question Rendine's assessment of witnesses at the time of trial, it was properly admitted for that purpose. *See* (Obj. #1 at 2) (acknowledging that the statement was not used for the truth of the matter asserted).[10] Moreover, Judge Strawbridge refers to Mitchell's statement in his presentation of the facts; he does not rely on the statement for its truth in any part of

---

[10]     Mitchell also claims that Rendine "testified that the statement was not relevant." (Obj. #1 at 2.) Mitchell mischaracterizes Rendine's testimony, in which he was merely responding to how the statement may or may not have informed his representation of Mitchell:

|  |  |
|---|---|
| Respondents' Attorney: | If you were presented with a witness who claimed that he was at a house a block away, would you have some concern that the Commonwealth would use [Mitchell's] statement to counter such testimony? |
| Rendine: | I don't think this would have prevented me from calling a witness that would have helped my client's case . . . even if his statement were a little different from that witness. I guess it depends. But I can't give you a definite answer to that. |
| Respondents' Attorney: | But it would be something that you would have considered? |
| Rendine: | Could have. |

(Evid. Hr'g Tr. 72:6–18, ECF No. 111.)

his analysis. *Compare* (Supp. R. & R. at 8–10 & n. 10) (providing factual background), *with* (*id.* at 44–62) (discussing claim).[11]

## C

Mitchell contests Judge Strawbridge's findings regarding an exchange between Rendine and Judge Sabo following closing arguments in 1991. *See* (Obj. #2 at 2–3) (citing Supp. R. & R. at 17 n. 21). Because Rendine told Judge Sabo that he did not know what other witnesses would say if they testified, Mitchell argues that Rendine admitted his "failure to prepare witnesses" and failure "to investigate his case." (*Id.* at 3.) Respondents contend that Rendine's evasive response to Judge Sabo was an attempt "to avoid being forced . . . to reveal the precise, and evidently unhelpful, content of the witnesses' testimon[ies]." (Resp. Opp'n at 10.)

In his closing argument in 1991, the prosecutor pointed out that the jury had not heard from three witnesses that were allegedly with Victoria Martinez on the night of Scott's murder and argued that this was proof that Martinez's testimony was fabricated. *See* (Trial Hr'g Tr. 148:20–150:6, Feb. 21, 1991); (Supp. R. & R. at 17 n. 21). After the jury was dismissed, Rendine objected to the prosecutor's "missing witnesses" remarks. *See* (Trial Hr'g Tr. 152:11–18); (Supp. R. & R. at 17 n. 21). Judge Sabo determined that the prosecutor was allowed to comment on the fact that Rendine elected not to call those witnesses. *See* (*id.*) The following exchange ensued:

---

[11]     Judge Strawbridge's discussion of the statement in the Supplemental R. & R.'s factual background is in line with the limited use of the statement established at the evidentiary hearing:
> [T]his statement did *not* place Mitchell outside of Victoria Martinez's house at 4027 N. 8th Street leading up to the shooting (as did the trial testimony of Ms. Martinez), nor did it place him inside of the Griffin/Moore/Corey house at 3056 N. 8th Street at any time (as did the affidavits purportedly executed by Moore and Griffin in 1997 and 1999 indicating that Mitchell was in the living room of their home at the relevant time . . . .

(*Id.* at 9 n. 10) (emphasis in original).

| The Court: | Those other two witnesses, you mean those other two would come in and substantiate what Victoria said? |
| . . . | |
| Rendine: | Judge, I don't know what they would have testified to. |
| The Court: | Well, you subpoenaed them, Counselor. |
| | |
| Rendine: | I have no idea what—how would I know what they would say, Judge? . . . I don't know what somebody will say until they take the stand and say it. How would I possibly know what somebody is going to say? |
| . . . | |
| The Court: | Well, I know you don't know. |
| | |
| Rendine: | You have an expectation of what they will say but you do not know what they will say. |

(Trial Hr'g Tr. 154:15–156:2.) At the federal evidentiary hearing, Judge Strawbridge asked Rendine about the missing witnesses:

| Rendine: | I don't believe any of those witnesses had anything relevant to say . . . [so] I didn't call them. [The prosecutor] made a comment during [his] closing argument that the jury should draw an adverse inference because I didn't call them, which I objected to . . . And afterwards [Judge Sabo] wanted to know what they would say. And I said, well, Judge, I don't what anybody is gonna say until they get on the witness stand and say it. And I had interviewed them. I don't remember what they were going to say, but . . . my belief is that when I was being evasive with him, because I didn't want to say they really didn't have too much to say. |
| | |
| The Court: | So you were not saying that you had not interviewed them? |
| | |
| Rendine: | I was not saying I had not interviewed them. |

(Evid. Hr'g Tr. 100:15–101:16, ECF No. 111.) Based on this testimony, Judge Strawbridge determined that Rendine *had* interviewed the other witnesses but was trying to avoid revealing to Judge Sabo what he believed to be their seemingly unhelpful testimony.

Mitchell's broader assertion that Rendine was deficient in his investigation of the case is belied by the record and the strategy pursued at trial. With respect to the performance prong of the *Strickland* analysis, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 690. A petitioner can overcome the *Strickland* presumption by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound. *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). Where "strategic choices [were] made after a thorough investigation of law and facts," the presumption is strong and "virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690).

Rendine's theory of misidentification was informed by his investigative efforts leading up to trial. After Rendine first appeared on Mitchell's behalf in 1990, he obtained a number of witness statements and other reports from the District Attorney's Office in response to discovery requests. *See* (Supp. R. & R. at 10). When Rendine learned that Mitchell's prior counsel had hired an investigator to interview various witnesses, he obtained an order from Judge Sabo directing prior counsel to turn over the OSI Report. *See* (*id.*). The OSI Report contained ten interviews conducted between

May 25 and June 14, 1990.  *See* (*id.* at 34).  There was no reference to Moore or Griffin in any of them.  *See* (*id.* at 34–35).  One of the interviewees was Adriene Corey, Griffin's daughter and Moore's niece.  *See* (*id.* at 35).  She stated that she believed Kevin Johnson killed Scott.  *See* (*id.*).  At trial, Rendine argued that Mitchell was not the shooter and suggested in a line of questioning that it may have been Johnson.  *See* (Trial Tr. 146–151).  When other witnesses came forward with information, the record reflects that Rendine promptly acted upon it, presenting it to the court on February 25, 1991 and in post-trial motions thereafter.  *See* (Supp. R. & R. at 17–18).

When Rendine was asked at the evidentiary hearing before Judge Strawbridge if he would have telephoned (or had his investigator telephone) the persons who indicated in the OSI Report that they saw Johnson kill Scott, he answered that "[t]here's no doubt about that."  (Evid. Hr'g. Tr. 58:6–10, ECF No. 111.)  However, when asked if "anyone offer[ed] to testify that they saw someone else shoot the victim," Rendine responded that "[o]nly after the trial occurred."  (*Id.* at 39:4–6.)  Rendine further explained that he interviewed "[w]hoever came to Court" for the trial, whether by his subpoena or otherwise.  (*Id.* at 39:6–21.)[12]  Accordingly, Mitchell has not shown that Rendine's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.

---

[12]  In a separate objection, Mitchell again calls into question Rendine's investigation of the case, this time claiming that Judge Strawbridge failed "to make a finding whether [Rendine] in fact conducted a defense investigation."  (Obj. #5 at 5–6.)  However, Judge Strawbridge held that "no such credible witness appeared to Rendine prior to the close of the defense case, and that *no failure to have uncovered a credible witness offering this testimony resulted from a deficient investigation.*"  (Supp. R. & R. at 54) (emphasis added).  Judge Strawbridge stated that "[t]his conclusion [in part] is supported by Rendine's credible testimony that he does not remember having this sort of evidence presented to him until after trial and that he remembers that prior to and during the trial much hearsay, but no credible statements, were offered to him suggesting an alternative perpetrator."  (*Id.*)  The Court accepts Judge Strawbridge's crediting of Rendine's testimony regarding his investigation of Mitchell's case.  *See supra* Part III.A.

D

Mitchell asserts that Judge Strawbridge's discussion of the OSI Report is "accurate" but "incomplete." (Obj. #3 at 3.) Judge Strawbridge stated that the OSI Report was "not appended nor referred to in any of Mitchell's state or federal pleadings" but was "marked by Respondents as a potential exhibit and produced to Petitioner" in advance of the evidentiary hearing. (Supp. R. & R. at 34) (citation omitted). Mitchell argues that the "first [habeas] counsel saw the OSI Report was when it was produced in preparation for [the] hearing by [R]espondents" and that the OSI Report "was not in any of the files counsel obtained from prior counsel or through petitioner's family." (Obj. #3 at 3.) Respondents assert that the OSI Report was prepared on Mitchell's behalf for the state court trial and, therefore, he "obviously possessed [it]." (Resp. Opp'n at 11.)

The record shows that the OSI Report was commissioned by Mitchell's defense counsel prior to Rendine's representation. (Supp. R. & R. at 34.) On November 30, 1990, Judge Sabo required production of the Report. (*Id.*) It was provided to Rendine on December 5, 1990. (*Id.*) Consequently, Mitchell's habeas counsel likely had access to a copy of the Report. Regardless of whether or not Mitchell's habeas counsel had the Report, Judge Strawbridge accurately discussed the Report's history in his Supplemental R. & R.

E

Mitchell argues that Judge Strawbridge should not have allowed Rendine to "testify speculatively . . . about what he might have done or what he would have done" when he "lacked personal knowledge" about the "relevant details" of Mitchell's trial.

(Obj. #4 at 4–5.)  Due to the passage of time between the state court trial and the evidentiary hearing, Respondents assert that Rendine was allowed to testify about his customary practices.  (Resp. Opp'n at 12.)

An attorney can testify to his usual practices when the passage of time inhibits his ability to recall the details of a particular case.  *See Eberhardt v. Wenerowicz*, No. CV 13-1700, 2015 WL 12602759, at *7 n. 10 (E.D. Pa. June 22, 2015) (determining that it is proper to consider evidence of attorney's usual practice, particularly where he cannot recall specifics given the passage of time); *see also Carrion v.* Smith, 549 F.3d 583, 590 (2d Cir. 2008) (upholding reliance on trial counsel's "testimony concerning his usual practice, particularly in light of the fact that [he] was being asked to remember events that occurred over twelve years earlier").  Because Rendine was asked to remember details from a trial that occurred eighteen years earlier, he was allowed to testify about his customary practices at that time.[13]  Further, Rendine's inability to recall does not by itself overcome the presumption that counsel made decisions "in the exercise of reasonable professional judgment."  *Strickland,* 466 U.S. at 689–90.

## F

Mitchell contests Judge Strawbridge's factual finding that "[n]o witnesses interviewed by the OSI investigator, including Adriene Corey (the daughter of Vanessa Griffin and niece of Leatrice Moore), suggested that Moore or Griffin had any information about either Mitchell's alleged involvement in the shooting or the alleged role of Kevin Johnson."  (Obj. #6(a) at 6) (quoting Supp. R. & R. at 42–45).  Mitchell

---

[13]    Again, to the extent that Mitchell objects to Rendine's testimony regarding his usual practice, *see* (Obj. #14 at 13), the Court will not substitute its credibility assessments for those of Judge Strawbridge.  *See supra* Part III.A.

argues that while "Moore and Griffin's names were not mentioned in an investigation [this] does not permit an inference that they were not witnesses to the shooting." (*Id.* at 6–7.) Mitchell misunderstands Judge Strawbridge's finding. Judge Strawbridge did not determine that Moore and Griffin were not witnesses *because* their names were not mentioned in the Report; rather, he states that the witnesses in the OSI Report did not mention Moore or Griffin as having any information about the shooting—a fact that Mitchell does not contest. *See* (Supp. R. & R. at 42); *see also* (Obj. #6(a) at 7).

## G

Mitchell objects to Judge Strawbridge's determination that Griffin was unwilling to testify during the guilt phase of Mitchell's trial and that she "expressed a willingness, and made herself available, to testify on [Mitchell's] behalf *only after* Mitchell had been convicted of the murder." (Objs. #6(b)–(c) at 7) (quoting Supp. R. & R. at 43) (emphasis added). Contrary to Mitchell's argument that "[n]othing in the record permits [these] inference[s]," (Obj. #6(b)), Judge Strawbridge recounted evidence at length supporting both conclusions. *See* (Supp. R. & R. at 43). Notably, even eight years after Mitchell's trial, Griffin testified that she was unwilling to put in her 1999 affidavit that Kevin Johnson killed Scott because she was "scared." (Evid. Hr'g Tr. 171:1–18, ECF No. 111.)[14]

---

[14]  In support of this objection, Mitchell states that Patricia Mitchell Oden "observed Rendine speaking to Moore and Griffin." (Obj. #6(c).) But Oden admitted at the evidentiary hearing that she was not privy to that discussion because she was "inside the courtroom" and thus could not confirm whether Moore or Griffin expressed a willingness to testify at trial. (Evid. Hr'g Tr. 18:24–19:20, ECF No. 112.)

H

Mitchell objects to Judge Strawbridge's factual finding that "[t]he first time Moore's name appears in the record is in Mitchell's *pro se* PCRA petition filed on January 10, 1997, when he refers to her as 'after discovered evidence' that 'was not available until after conviction.'" (Obj. #6(e) at 8) (quoting Supp. R. & R. at 44.) This is a factually true statement that Mitchell does not contest. To the extent that Mitchell asserts that Moore would not have been discovered as a witness until the PCRA petition, the record reveals that, like Griffin, Moore had several chances to come forward but did not. Moore did not tell the police what she observed on April 12, 1990 even though she interacted with them in the aftermath of the murder—both when the police responded to the scene and the next morning when they were in the house. *See* (Supp. R. & R. at 26, 44). She testified that she made no effort to contact the police because she "was going on with [her] life." (Evid. Hr'g Tr. 157:12–22.) Moreover, Judge Strawbridge noted that her hearing testimony in 2009 contradicted the affidavit she provided in 1997. For example, in her affidavit, Moore stated that she had "constant contact" with Mitchell throughout their lives and that she would have testified at trial that she had known him for fifteen years. Aff. of Leatrice Moore ¶¶ 2–3; (Supp R. & R. at 27 n. 32). However, at the evidentiary hearing, Moore denied knowing Mitchell for a long time or very well. (Evid. Hr'g Tr. 153:15–20, 158:1–25, ECF No. 111.)

I

Mitchell also questions Judge Strawbridge's determination that Rendine "proceeded with diligence in his attempts to present exculpatory evidence as soon as it became available, *e.g.*, beginning on February 25, 1991." (Obj. #6(f), at 8; Supp. R. & R.

at 45.)  Judge Strawbridge found ample evidence to reach this conclusion.  As soon as

he learned that there were witnesses purportedly willing to testify that Mitchell was

innocent, Rendine told Judge Sabo.  *See* (Supp. R. & R. at 17–18).  He then did what the

court told him to do and filed post-trial motions raising that issue.  *See* (*id*. at 18–19).

On March 20, 1992, Rendine continued to press for the right to offer after-discovered

evidence but was advised to file a PCRA petition.  *See* (*id*. at 19).  Mitchell's own *pro se*

"Motion for Reconsideration of Sentence & Petition for Writ of Coram Nobis" asked the

court to consider "after discovered evidence" that "was not available to defendant for

trial in [ ] spite of due diligence."  *See* (*id*. at 21) (citation omitted).

J

Mitchell argues that because his ineffective assistance of counsel claim was not

adjudicated on the merits in state court, it deserves *de novo* review.[15]  *See* (Obj. #7 at 9;

Obj. #9 at 11; Obj. #10 at 11; Obj. #15 at 13; Obj. #16 at 13).  Judge Strawbridge

determined that "[t]he Superior Court's merits analysis of the *Strickland* claim

involving Rendine's failure to have called Moore and Griffin confines our analysis under

AEDPA."  (Supp. R. & R. at 52.)

The Superior Court agreed with the PCRA Court's decision, adopting it at

length.  *See Com. v. Mitchell*, slip op. at 8–9.  It agreed with the PCRA Court's holding

that "since [Mitchell has failed to show that he was prejudiced by the absence of

testimony from th[e]s[e] witness[es] at trial, his claim was dismissed as meritless."  *Id.*

at 9.  The Superior Court added that Mitchell's failure to submit Moore and Griffin's

---

[15]     Notably, Mitchell previously argued that his claim *was* adjudicated on the merits in his brief
in support of his habeas petition.  *See* (Pet'r Br. at 21–30, ECF No. 10) (arguing unreasonable
application of clearly established law).

original affidavits as part of the official record was "fatal" to his claim that Rendine was ineffective for failing to call them as alibi witnesses. *Id.* at 10–11; *see also Commonwealth v. Upshur*, 2018 WL 4998301, at *2 (Pa. Super. Ct. Oct. 16, 2018) (quoting *Commonwealth v. Carter*, 661 A.2d 390, 396 (Pa. Super. Ct. 1995)) ("Ineffectiveness for failing to call a witness will not be found where a defendant fails to provide affidavits from the alleged witnesses[.]"). "Finding no merit to any of the PCRA claims," the Superior Court affirmed the denial of Mitchell's petition. *Id.* at 11; *see Thomas v. Horn,* 570 F.3d 105, 117 (3d Cir. 2009) (holding that under § 2254(d) a claim has been adjudicated on the merits "when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground").

## K

Besides arguing again that the Superior Court did not decide the claim on the merits, the Court understands Mitchell's next objection to be that the Supplemental R. & R. made a "factual error" in suggesting that PCRA counsel did not focus on Moore and Griffin as alibi witnesses in his brief. (Obj. #9 at 10–11.) Mitchell misreads the Supplemental R. & R., which accurately represents that PCRA counsel prepared a "Supplemental Amended PCRA Petition" alleging that Moore and Griffin "were among the individuals with Victoria Martinez and Petitioner at Martinez's residence . . . when the fatal shot was fired and thus would have corroborated Martinez's 'alibi' testimony." (Supp R. & R. at 50.) Judge Strawbridge then noted that Mitchell filed a *pro se* Response to the PCRA Court's Notice of Intent to Dismiss his PCRA petition, which focused "exclusively on Attorney Rendine's failure to call individuals who were present

with him at Victoria Martinez's residence . . . [and] Moore and Griffin were not, however, alleged to be in that category." (*Id.* at 50–51.)

## L

Mitchell objects to the Judge Strawbridge's "failure to consider [the] prejudice prong" of *Strickland*. (Obj. #15 at 13.) Because Judge Strawbridge found that Rendine did not perform deficiently (Supp. R. & R. at 52–58), he stated that it was not "necessary to make a definitive finding on the prejudice prong of the *Strickland* analysis here." (*Id.* at 60.) Judge Strawbridge was not required to do so. *See United States v. Travillion*, 759 F.3d 281, 294 (3d Cir. 2014) ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.") (quotation omitted).

## M

Lastly, Mitchell objects to Judge Strawbridge's denial of a certificate of appealability, arguing that the Supplemental R. & R. is "clearly decided on procedural grounds." *See* (Obj. #17 at 14.) The Supplemental R. & R. contains no "procedural" ruling. *See* Supp. R. & R. at 52–58 (concluding on the merits that "Mr. Rendine did not perform deficiently"); *id.* at 59–60 ("We have no hesitation in opining . . . that Mitchell has not demonstrated that the Superior Court's rejection of this claim in the PCRA appeal decided on January 18, 2005 reflected an unreasonable application of *Strickland* or any other United States Supreme Court precedent as of that date.").

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must "demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, a certificate of appealability will not issue because reasonable jurists would not debate this Court's ruling, and Rendine has not made a substantial showing of a denial of a constitutional right as required under 28 U.S.C. § 2253(c)(2).[16]

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[16] In his R. & R., Judge Strawbridge stated that he would file a Supplemental R. & R. in which he would "make a recommendation as to whether . . . a certificate of appealability should issue pursuant to 28 U.S.C. § 2253(c)(2) as to any of the claims raised in the petition." (R. & R. at 79 n.72.) In his Order adopting the R. & R., Judge Gardner dismissed Mitchell's other objections without prejudice, allowing him to raise them after the Supplemental R. & R. was filed. *See* (Order at 5). Mitchell never did.

Thus, the Court agrees that a certificate of appealability should not issue as to: Mitchell's ineffective assistance of counsel claim for failure to call Moore and Griffin because Mitchell did not establish that Superior Court's disposition was an unreasonable application of *Strickland*; his ineffective assistance of counsel claim for failure to call Charese Bennett, Arthur Dargan or Juanita Herndon because it was not presented to the Superior Court; and his claim that his Fifth Amendment rights were violated because the Superior Court did not unreasonably apply Supreme Court precedent in denying relief. *See* (Supp. R. & R. at 61–62).